**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**STEPHEN JOSEPH HYETT,**

**Plaintiff,**

**v.**

**CIVIL ACTION NO.: 1:19-CV-216**
**(JUDGE KEELEY)**

**ANDREW SAUL,**
**Commissioner of Social Security,**

**Defendant.**

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

On December 5, 2019, Plaintiff Stephen Joseph Hyett ("Plaintiff"), by counsel James T. Carey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Andrew Saul, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). [Compl., ECF No. 1]. On February 13, 2020, the Commissioner, by counsel Tara N. Tighe, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. [Answer, ECF No. 6; Admin. R., ECF No. 7]. On March 16, 2020, and April 13, 2020, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. [Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 10]. Following review of the motions by the parties and the Administrative Record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

1

## II. PROCEDURAL HISTORY

On May 22, 2014, Plaintiff filed an application for Social Security Disability under Title II for Child Disability Benefits, alleging disability that began on September 5, 1976, the date of his birth. (R. 10, 13). As such, Plaintiff sought benefits pursuant to the provision under the Social Security Act allowing payment of benefits to a claimant who is age 18 or older, whose disability began prior to turning age 22. (R. 11-12). Defendant denied the claim on August 22, 2014, and denied it again upon reconsideration on December 9, 2014. (R. 10). On February 12, 2015, Plaintiff filed a written request for hearing. (R. 10). Such a hearing was held on May 23, 2017 by video before Administrative Law Judge ("ALJ") Nikki Hall. Id. Plaintiff, represented by counsel James Carey, appeared from Wheeling, West Virginia. Id. At the hearing also appeared an impartial vocational expert, Larry Ostrowski, Ph.D, by telephone. (R 10, 36).

On June 12, 2017, the ALJ issued an unfavorable decision to Plaintiff. (R. 10, 142). In this decision, the ALJ determined that, prior to age 22, Plaintiff had the residual functional capacity for performing sedentary work, with some exceptions. (R. 146). However, Plaintiff filed a request for review with the Appeals Council. (R. 10). The Appeals Council granted Plaintiff's request and issued a remand order on June 20, 2018, finding that the ALJ's determination of June 12, 2017 did not account for all of Plaintiff's functional limitations. (R. 10, 158). Particularly, the Appeals Council found that, at step two of the ALJ's analysis, the ALJ recognized Plaintiff's left hemiparesis as a severe impairment. (R. 159). Thus, the Appeals Council found, the RFP should incorporate manipulative limitations. Id. The Appeals Council directed the ALJ to (1) further evaluate Plaintiff's subjective complaints, (2) further consider Plaintiff's RFP and specify evidence in support of limitations the ALJ assesses, and (3) take a VE's supplemental evidence as to these specific measures. (R. 160).

Pursuant to the Appeals Council's order of remand to the ALJ, the ALJ held another hearing on November 1, 2018. (R. 10). Plaintiff appeared and testified at this hearing, and was represented by counsel James Carey. Also testifying at this hearing was a vocational expert, Dana M. Stoller. Then, on November 18, 2018, the ALJ issued another decision unfavorable to Plaintiff. Id. The ALJ concluded that Plaintiff, before age 22, "did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" set forth in the pertinent regulations. (R. 15). Further, the ALJ concluded that Plaintiff, before age 22, "had the residual functional capacity to performed sedentary work," and detailed the types of tasks Plaintiff could execute, as well as his limitations. Id.

Although Plaintiff again appealed the ALJ's decision, the Appeals Council denied Plaintiff's request for review (R. 1), making the ALJ's decision the final decision of the Commissioner. Thus, Plaintiff appealed here.

### III. BACKGROUND

#### A.    Personal History

Plaintiff was born on September 5, 1976; the date of his birth is his alleged disability onset date. (R. 20). Plaintiff reached age 22 on September 5, 1998. A claimant for Child Disability Benefits must demonstrate disability onset before age 22. Thus, as the date of his alleged disability onset is at his birth, Plaintiff claims disability prior to age 22. Plaintiff, if entitled to Child Disability Benefits, would be eligible to receive them after attaining age 18.  When he first filed his claim for Child Disability Benefits, on May 22, 2014 (R. 10), Plaintiff was over the age of 18.

As for Plaintiff's formal education, he graduated from John Marshall High School. (R. 43). During high school, he had some special education classes, principally for math. (R. 49). Plaintiff

had an Individualized Education Plan (IEP). (R. 49). He attended junior college classes for approximately seven years. (R. 45). At junior college, Plaintiff developed keyboarding skills. Id.

As for employment at the time of the proceedings before the ALJ on May 23, 2017, Plaintiff was not employed. (R 46). Also, at that time, Plaintiff was involved in volunteering, through 4-H and Special Olympics. Id. At a prior time, over two seasons, Plaintiff was employed part-time as a janitor for summer youth programs. (R 324-325). As for driving, while Plaintiff took a driver's education course in high school, he was unable to obtain a driver's permit because of vision impairment related to his underlying medical conditions. (R 47, 49-50).

During proceedings before the ALJ on May 23, 2017, Plaintiff testified that he was not married and had no dependent children. (R. 41-42). This remained the case as of proceedings before the ALJ on November 1, 2018. (R. 73). He has lived with his mother and father in a single-level home with a basement. (R. 42, 73). Plaintiff lived with his parents since his birth. (R. 49, 81). He had a computer and a smartphone for accessing the Internet, on which he played games and utilized social media. (R. 43-44). Plaintiff testified that he had email. (R. 44). Plaintiff also testified that he can read, although he has some issues with reading comprehension, and can perform simple math. Id.

**B.       Medical History from Onset Date of  September 5, 1976 to Age 22**

Plaintiff experienced health and medical issues from the time of his birth or shortly thereafter. (R. 83, 105). In short, these include a subdural hematoma, a type of brain bleeding, which resulted in hydrocephalus, a buildup of fluid. (R. 918). These conditions required shunting. Id. In his childhood, Plaintiff's shunt malfunctioned at times. (R. 918, 941). However, Plaintiff as a child also underwent surgery to repair the shunt. Id. The surgeries for shunt repair appear to have

been successful. (R. 17). Additionally, Plaintiff experienced seizures in childhood, resulting from these conditions. Id. However, by 1990, it appears that the seizures were controlled. Id.

More particularly, as to the onset and timeframe of his alleged disability, Plaintiff's history is of noncommunicating hydrocephalus status post ventriculoperitoneal shunt secondary to subdural hematoma during birth. (R. 427). According to Plaintiff, this condition gave rise to weakness on his left side, and to a condition by which he has no peripheral vision or vision below. (R. 324). Has a discrepancy in his left leg length and an equinovarus deformity of his left foot (foot twisted out of shape). (R. 976). Owing to the leg length discrepancy, Plaintiff wears an orthopedic shoe to elevate the shorter leg. (R. 483). He has left-sided hemiatrophy. (R. 976).

Although the Plaintiff had a shunt placed to aid with these conditions, the shunt malfunctioned intermittently during his childhood. (R. 918). On July 25, 1989, when Plaintiff was age 12, he was treated at Children's Hospital of Pittsburgh by Leland Albright, M.D. for a shunt malfunction. Id. At the time, the shunt malfunctions had spontaneously resolved in preceding months. Id. However, at this point, Plaintiff had presented at the emergency room with an hours-long severe headache. Id. Plaintiff was admitted to the hospital and underwent a surgical procedure for shunt revision, and the headaches subsided. Id. He was discharged from the hospital on July 28, 1989. Id. Then, on December 24, 1990, at age 14, Plaintiff again saw Dr. Albright for headaches, nausea, and vomiting, which were indicative of shunt malfunction. (R. 941). Plaintiff underwent another procedure for shunt revision that same day. Id. The procedure appears to have been successful, as Dr. Albright indicated that there were no complications from the procedure and that Plaintiff was stable post-operation.  Id. Plaintiff was discharged from the hospital in good condition on December 26, 1990. Id.

Subsequent records in Plaintiff's medical history indicate that Plaintiff managed well after these procedures. A progress note by Mark S. Scher, M.D. in the Division of Child Neurology, Children's Hospital of Pittsburgh on April 9, 1991 indicates that Plaintiff was doing well after the procedure which he underwent the prior December, and that his seizures were controlled satisfactorily with medication. (R. 949).  Dr. Albright examined Plaintiff again on July 15, 1991 and reported that Plaintiff had had no seizures in the preceding four years. (R. 950). Dr. Albright further reported that Plaintiff was not presenting with any symptoms which would indicate shunt malfunction. Id. Plaintiff's shunt appeared to be functioning, and Dr. Albright did not wish to reexamine Plaintiff for one year, absent problems in the meantime. Id.

Dr. Scher conducted a follow-up visit with Plaintiff on or about October 8, 1991, when Plaintiff was age 15. (R. 951). Plaintiff's seizures were well-controlled with medication, with no indication of drug toxicity. Id. Plaintiff was performing well academically and had "no outstanding behavioral, sleep, or general medical problems." Id.

Dr. Scher conducted a follow-up visit with Plaintiff on or about April 28, 1992. (R. 952). Again, Plaintiff's seizures were well-controlled with medication, with no indication of drug toxicity. Id. Plaintiff's academic performance was reported to be satisfactory with some difficulty with math, and again Plaintiff had "no outstanding behavioral, sleep, or general medical problems." Id.

Dr. Albright examined Plaintiff again on July 13, 1992, at which point there was no recent indication of shunt malfunction. (R. 953). Plaintiff had had no seizures in the preceding five years. Id. His shunt appeared to be functioning as intended, with Plaintiff not scheduled to follow up for one year unless he experienced a shunt malfunction. Id.

Dr. Scher examined Plaintiff again on or about October 20, 1992. (R. 954). Plaintiff had had no new seizures, and his seizures continued to be controlled with medication. Id. Dr. Scher did indicate Plaintiff was having some issues with academic performance, particularly with English and mathematics. Id.

Dr. Albright examined Plaintiff on or about April 20, 1993, at which point Plaintiff had no new seizures or apparent problems with his shunt. (R. 955). Dr. Albright did indicate Plaintiff was having some issues with academic performance, particularly with English and mathematics. Id.

Dr. Scher examined Plaintiff on or about October 19, 1993 and reported that Plaintiff continued to be free of seizures and had no apparent problems with his shunt. (R. 956). Plaintiff was reported to have appropriate sleep hygiene, and "no behavioral or academic difficulties." Id. He was reported to be "doing somewhat better scholastically in school." Id. Plaintiff, then in twelfth grade, had plans to enter junior college to enroll in mathematics, computer, and keyboarding courses. Id. His physical conditions remained unchanged from prior examination, and included a left hemiparesis consisting of hyperreflexia, hypotrophy of the left upper and lower extremity, and left hononomos hemianopsia. Id. He was reported to be ataxic, and as having a gait disturbance and showing circumduction and inability to tandem walk. Id.

Plaintiff had a follow-up visit with Dr. Scher on or about April 14, 1994. (R. 957). Plaintiff remained free of seizures, with prescribed medication. Id. Plaintiff was reported to be performing acceptable work academically, with plans of entering community college and having "no outstanding concerns." Id. Again, on or about October 25, 1994, Plaintiff had a visit with Dr. Scher. (R. 958). He continued to be seizure-free, with prescribed medication. Id. Plaintiff was reported to be performing well academically, to have worked as a janitor, and "working at North Community College with no outstanding concerns." Id. Dr. Scher examined Plaintiff again on or about April

25, 1995, who reported Plaintiff to be free of seizures, with medication, and to be a full-time student in community college with grades averaging in the B-C letter grade range. Id. Dr. Scher noted that Plaintiff was unable to drive. Id.

On May 25, 1995, Plaintiff presented with headaches and unsteady gait and was examined at Children's Hospital of Pittsburgh. (R. 962). A radiology report concluded that there was no evidence of hydrocephalus or of hemorrhage or extra-axial fluid collections. Id. A corresponding radiology report concluded that the shunt was in good position. (R. 963).

On July 12, 1995, Dr. Albright examined Plaintiff. (R. 964). The report of this visit indicates that Plaintiff was a high school graduate, and was attending community college while working as a janitor part-time. Id. Plaintiff had been seizure-free for eight years, with medication. Id. Dr. Albright noted that Plaintiff had "one or two episodes of headache, drowsiness, and nausea that might be symptoms of early shunt malfunction but they have not recurred in the last two months." Id. Dr. Albright indicated that Plaintiff need not return for two years unless issues arise. Id.

On or about October 10, 1995, Dr. Scher examined Plaintiff. (R. 965). The report from the examination indicates that Plaintiff continued to be seizure-free. Id. A headache from the prior July was reported to be secondary to sinusitis and the condition was resolved with medication. Id. Plaintiff continued to attend community college, although maintained a 2.0 grade point average. Id. Although Plaintiff still was unable to drive, Dr. Scher indicated there were "no other outstanding concerns." Id.

Dr. Scher evaluated Plaintiff again on April 16, 1996. (R. 966). Plaintiff remained seizure-free, with medication. Id. Dr. Scher indicated that Plaintiff had no behavioral problems, although he sometimes would forget that he had taken an evening dose of medicine and would take an

additional evening dose resulting in morning somnolence. Id. Plaintiff complained of no recent headaches, and continued to attend community college and attain passing grades. Id. Dr. Scher noted that Plaintiff did not drive a vehicle, but that there were "no other outstanding concerns." Id.

Dr. Scher evaluated Plaintiff on or about October 22, 1996. (R. 968). Plaintiff remained seizure-free, with medication. Id. Plaintiff had reported having headaches over the previous summer but was "not having any outstanding problems at present." He was enrolled in community college and majoring in journalism. Id. Dr. Scher evaluated Plaintiff again on or about April 15, 1997 and indicated that Plaintiff's condition remained unchanged with medication. (R. 969). Plaintiff had "no outstanding problems including seizures, headache or regression of skills." Id. Plaintiff still was enrolled in community college and planned to volunteer at his church. Id.

On August 6, 1997, at age 20, Plaintiff was examined by Dr. Mel Field of the Neurosurgery Clinic of Children's Hospital of Pittsburgh for a routine evaluation. (R. 970). Dr. Field's summary indicates that Plaintiff had not had a seizure in over 10 years, and remained on medication to control seizures. Id. Dr. Field indicated that Plaintiff had been doing "remarkably well" since his last visit. Id. Plaintiff reported no headaches recently except for sinus headache controlled with medication. Id. Plaintiff showed no significant change from his prior visit. Id. Dr. Field reported:

> He remains diffusely hyperreflexive with pain being more pronounced on the left than the right. He still has a left homonymous hemianopsia and shows a positive Babinski on the left. His strength however is normal and he has normal sensation. His shunt pump refills quite easily and he has a slight clonus on the left. Otherwise his cranial nerves were intact and he had no dysmetria or drift and Romberg was negative with normal gait. He has baseline nystagmus at rest and with lateral gaze bilaterally which is unchanged from his last examination a few years ago.

Id. Dr. Field further stated that Plaintiff "is quite functional" and on a "stable course" such that Plaintiff need not return for a follow-up for three years. (R. 970-971).

9

On or about October 13, 1997, at age 21, Plaintiff was evaluated by Dr. Catherine M. Foley of the Division of Child Neurology of Pittsburgh Children's Hospital. (R. 972-973). Plaintiff continued to be seizure-free, with medication. (R. 972). Dr. Foley indicated Plaintiff had done well in community college, where he was enrolled in two classes per semester and at which he studied word processing and developed an interest in sports writing. Id. Although Plaintiff had no plans to drive, he had "no side effects related to seizures, sedation, headaches, bleeding, bruising, hair loss, or confusion." Id. Further, Dr. Foley observed:

> General physical examination demonstrates left-sided hypotrophy with mild plethora and coolness of the left hand and foot. Neurologic examination demonstrates mild impairment of cognitive skills, with slow and articulate speech. Cranial nerve examination continues to demonstrate a left homonymous hemianopsia with left side hyperreflexia. The plantar sign is equivocal on the right and extensor on the left. Thumb finger apposition is slow and awkward on the left. Unipedal balance is impaired on the left.

Id. By way of follow-up on or about May 12, 1998, Dr. Foley indicated that there was no change in Plaintiff's physical examination or detailed neurologic examination since the time of his last consultation with her. (R. 974-975). Plaintiff was enrolled in a sociology class, and was involved with 4-H as a camper and junior counselor. (R. 974).

Dr. Foley again examined Plaintiff, on or about June 29, 1999, when Plaintiff was age 22. (R. 976). Plaintiff was enrolled in an algebra class in community college. Id. Dr. Foley summarized:

> On neurologic examination, [Plaintiff] was pleasant, friendly, and alert. Previously identified findings were again documented. Fund of knowledge was mildly impaired. His speech was dysfluent but understandable. Memory was intact for 3 of 4 objects at 5 minutes with prompting. Judgement is immature but he deferred readily to his parents and was not impulsive. He was unable to calculate accurately. Cranial nerve examination was remarkable for 6-8 beats of lateral nystagmus as well as a right gaze preference and left homonymous hemianopsia on clinical testing. Optic fundi were pale. There was mild left-sided weakness and spasticity in all muscle groups tested. Deep tenon reflexes were hyperactive on the left. There was a left Babinski sign. Sensory examination was intact to light touch but a mild

hypalgesia was present in the left hand. On coordination testing, there was mild oral motor apraxia. There was posturing of both hands, left more than right, on out-stretched arms. The patient demonstrated a dystonic lordosis on ambulation. He could balance for 5 seconds on the right foot, but on the left [h]is gait was awkward with impaired righting reflexes.

(R. 977).

## C. Medical Reports/Opinions

The record does not contain medical source statements for the period at issue, prior to Plaintiff attaining age 22. However, the ALJ considered four opinions post-dating such period, three of which are summarized below.[1]

### a. *Dr. Leland Albright's Opinion*

On October 7, 2003, Plaintiff's treating physician, Leland Albright, M.D., provided a one-page *Statement of Dependent Eligibility Beyond Limiting Age in Plan Due to Mental Retardation or Mental or Physical Handicap*. (R. 422). Dr. Albright stated that Plaintiff's date of being incapable of employment was at his birth, on September 5, 1976. Dr. Albright noted Plaintiff had both a physical and mental handicap. Dr. Albright listed Plaintiff's conditions resulting in his incapacity: seizure disorder, left hemiparesis, hydrocephalus, right porencephalic cyst, left hemianopsia, birth trauma resulting in skull fracture, subdural hematoma, preneoplastic cyst, hydrocephalus, left hemiparesis, and seizure disorder. Id. Dr. Albright indicated that Plaintiff was ambulatory. Id. It was unknown to Dr. Albright whether Plaintiff had a job or whether Plaintiff

---

[1] One of the opinions briefly referenced and largely discounted by the ALJ is "the State Agency Psychological Consultant's opinion." (R. 19). The ALJ's decision does not cite to the record for where this opinion is located, and it is not entirely clear from the undersigned's own review of the record what this opinion is or where it is located. Nonetheless, the ALJ indicates that the opinion did not rely on evidence about Plaintiff's functioning during the relevant period. Id. Also, it does not appear that Plaintiff cites an opinion by that name or relies heavily upon it (or relies upon it at all) in assigning error to the ALJ. Thus, the undersigned assumes that this opinion rightly was discounted by the ALJ for its omission of evidence during the relevant period.

had been able to do full or part-time work of any kind. Id. Dr. Albright's opinion was that Plaintiff would not be capable of self-support. Id.

### b. *Dr. Zaveen A. Kureishy's Opinion*

On January 4, 2017, another of Plaintiff's treating physicians, Zaveen A. Kureishy, M.D., evaluated Plaintiff resulting in a four-page summary. The argument before the ALJ about this opinion appears to have focused on the summary contained on the third page therein. (R. 578)[2]. There, Dr. Kureishy indicates that Plaintiff complained of back pain, abnormal gait, focal weakness, decreased concentration, irritability, and panic attacks. Id. In the section for noting "neurologic details," Dr. Kureishy noted the following: weakness left side, tremor, fine coordination a problem, unsteady gait. Further, Dr. Kureishy noted an assessment/plan as to the following: seizure, benign essential hypertension, gastroesophageal reflux disease, history of traumatic brain injury, hydrocephalus, and left-sided muscle weakness. Id.

### c. *Dr. Ellen Kitts's Opinion*

On October 31, 2018, Dr. Ellen L. Kitts, M.D., completed a three-page Job Capabilities form concerning Plaintiff. (R. 1002-1004). Dr. Kitts concluded as follows:

  i.   Plaintiff could stand/walk for one-half hour at one time, and a total of four hours or less, in an eight-hour workday.

  ii.  Plaintiff could sit for one-half hour at one time, and a total of four hours or less, in an eight-hour workday.

  iii. Plaintiff could not drive, and so there was no evaluation of how much time in a workday Plaintiff could drive.

---

[2] This summary appears to be a part of a larger submission by Plaintiff's counsel of some 171 pages of records from Dr. Kureishy. However, the argument and review before the ALJ seems to have focused on this single page of the 171-page submission. (R. 578).

iv.    Plaintiff could not drive to/from work.

v.    The maximum Plaintiff could lift/carry is 10 pounds, with a frequency of occasionally, using his right hand only.

vi.    Plaintiff could use either foot for repetitive movements as in operating foot controls or pedals. He could not use his right foot because he would get confused and not be accurate, e.g. would depress the accelerator instead of the brake. He physically could not use his left foot.

vii.    Plaintiff could occasionally bend, and could occasionally climb stairs with a right-hand rail. He was not at all able to: squat, kneel, crawl, climb stairs, or climb a ladder.

viii.    In his left hand, arm, and shoulder, Plaintiff had no power grip, simple grasping, medium dexterity, fine manipulation, forearm rotation, pushing/pulling, or bimanual dexterity. As to this same left-side function, Plaintiff could occasionally feel (shape, size), reach above shoulders (but not grasp), and reach at/below shoulder level (but not grasp). He had no bimanual dexterity. In his right side, Plaintiff could use his hand, arm, and shoulder occasionally for power grip, simple grasping, medium dexterity, reaching above shoulders, reaching at/below shoulder level, and pushing/pulling (one hand only). As to this same right-side function, Plaintiff could frequently use his hand, arm and shoulder for fine manipulation, feel (shape, size), and forearm rotation.

ix.    Plaintiff could not push, pull, carry or lift any weight with his left hand, arm, and shoulder. As to his right hand, arm, and shoulder, he could never push,

pull, carry or lift more than 10 pounds, although he frequently could do so with objects under 10 pounds.

x.　　Plaintiff could use his head/neck frequently in a stationary position, in frequent rotation, and in frequent flexing.

xi.　　Plaintiff was restricted by environmental factors, namely, unstable on wet or damp floors, and his muscles tightened in the cold.

xii.　　Plaintiff was involved with treatment and/or medication that might affect his ability to work, namely, seizure medicine which made him sleepy.

xiii.　　Plaintiff was required to use a brace on his left leg.

xiv.　　Plaintiff could perform physically sedentary work but he was not functional; he could not look down to write and could not follow directions.

Id. Dr. Kitts additionally commented that Plaintiff did not have lower visual fields and could not look down. Id. Plaintiff could not do three step commands, as he had difficulty with directions and commands. Id. Dr. Kittle determined that Plaintiff could answer a telephone but could not take messages. Id. Dr. Kittle remarked that Plaintiff: does comprehend what he reads, has "slow" math skills, has short attention, and has poor memory. Id. Dr. Kittle noted that Plaintiff had hydrocephalus with a shunt and had seizures. Id. She noted that these conditions started at birth and are lifelong problems. Id. Dr. Kittle summarized that Plaintiff is not employable. Id.

**D.　Testimonial Evidence**

At the ALJ hearing held on May 23, 2017, Plaintiff's mother, Judith Ann Hyett, explained Plaintiff's issues with the left side of his body and his resulting physical limitations.

Q:　　Okay. Does Stephen have problems with his left side?
A:　　Yes.
Q:　　Can you explain what those are?

14

> A:   Steven does not have the nerve – his brain does not tell the muscles what to do on the left side. And he has weakness on his whole left side. His left arm is not the same as far as dexterity. And it is not the same strength. His leg is shorter. He has a lift on his shoe of five-eighths of an inch. He shoe size is two sizes smaller on his left side than his right side.  His leg  is  not as muscular on the left side as it is on the right side.
>
> Q:   Now –
>
> A:   I'm sorry. And his vision on the left side.
>
> Q:   What type of problems do you notice him having because of the problems on his left side?
>
> A:   It's hard for him to lift things with his – his left hand is basically a helper. He does everything right handed. He has difficulty going up and down steps. He has to hold onto the handrail and take them one at a time. And he walks with a limp even though he has a brace. He has an AFO brace on his left foot, but he still walks with a limp.

(R. 50-51).

At this same ALJ hearing on May 23, 2017, Plaintiff's mother also testified as to Plaintiff's

mental and cognitive limitations.

> Q:   Okay. Have you noticed any mental issues?
>
> A:   Steven, if he reads something, he does not comprehend it. It has to be oral to him. And even giving him directions. If I give him directions to do two things, he gets confused.
>
> […]
>
> Q:   If you tell him to go get you something, can he do that?
>
> A:   If I tell him to go get me something, I have to specifically tell him where it's at. And them sometimes he even has a hard time bringing it back to – retrieving it and bringing it back to me. He has to go back again and again.
>
> Q:   Does he have any trouble with concentration and pace?
>
> A:   Concentration.
>
> Q:   Can you explain how he has a problem with concentration?
>
> A:   He gets very agitated if has to do two things in a row. He likes things steady and constant.
>
> […]
>
> Q:   All right. Does he have trouble adapting to new situations?
>
> A:   Yes.
>
> Q:   Can you explain that to me, give me an example?
>
> A:   He likes things constant. He likes things the same. For instance, he takes seizure medicine three times a day. And he is very good about it. But boy, he gets very nervous and upset if he's not home at 4:00 to take his medicine. It has to be step-by-step constantly.

15

(R. 51-53).

Also at the ALJ hearing held on May 23, 2017, Plaintiff testified that he graduated from John Marshall High School. (R. 43). He testified that, at the time, he had a computer and a smartphone with which he accessed the Internet. Id. Plaintiff testified that he used the Internet to play games and access social media, and that he used an e-mail account. (R. 44). Plaintiff testified that he can read but has difficulty with reading comprehension. Id. Plaintiff testified that he can write and perform simple math, and can complete at least simple monetary transactions. (R. 44-45). He testified that he enrolled in a driver education course but could not successfully complete the field test. (R. 47). Thus, he never acquired a driver's permit. Id. Further, Plaintiff's mother stated that Plaintiff could not drive a vehicle because "he has no peripheral vision out of the left side, or no down vision. And he had a hard time following directions. He would just ride around in a circle, in a circle . . . [h]e didn't know how to get out of the parking lot." (R. 49-50).

Additionally, Plaintiff's mother testified at the May 23, 2017 hearing that Plaintiff has a limp and balance problems, although he does not fall often. (R. 55). At another ALJ hearing on November 1, 2018, after remand from the Appeals Council, Plaintiff further explained that he could support an object with his left arm but cannot lift or carry objects with his left hand and left arm. (R. 77-78). At this same hearing on November 1, 2018, Plaintiff's mother testified that Plaintiff does not pick up items heavier than a drinking cup or a gallon of milk with his left hand, or he would drop such an object. (R. 84). At the hearing on November 1, 2018, Plaintiff testified that when walking, his left arm drops to his side such that he takes one step at a time to keep balance and avoid falling. (R. 78). However, Plaintiff further testified that he walks on a treadmill five times per week, although he holds onto the treadmill's support rail with his right hand when so doing. (R. 78-79).

16

Further, at the ALJ hearing on May 23, 2017, Plaintiff testified that he attended community college for approximately seven years. (R. 45). He testified that his performance was middling, although he picked up keyboarding and reading skills. Id. He testified that he never served in the military. Id. Plaintiff testified that he has income from an annuity, but that he receives no other disability payments and has no income from employment. (R. 45-46). Plaintiff's mother testified that this annuity arose from a lawsuit filed in the 1980s and that Plaintiff gets payments for his life as a result. (R. 53-54). Plaintiff stated that he does not receive food stamps, and that he has health insurance through his father's policy. (R. 45). Plaintiff states that he volunteers "to keep busy" through 4-H and Special Olympics.

Plaintiff's mother further testified on May 23, 2017 that she does not think Plaintiff can be employed because "He has limitations on comprehending things. And also he has physical limitations. It would be hard for him to do things with two hands together because of the left hand being so much weaker than the right hand." (R. 53). She further testified "It would be hard for him to lift if he had anything of significant weight. And he would have to be constant, the same thing." Id.

Plaintiff's mother testified that Plaintiff had one surgery for his shunt after turning age 22. (R. 54). According to his mother's testimony:

Q:     Did that result in any change in his capabilities?
A:     No. At first, yes. Because they had to move the shunt from the left side of
the    top of the head to the right side of the top of the head . . . For a week he
       could not walk a straight line. But then once his brain adapted to the change
       in the shunt on the top of the head, then he gradually started walking
       correctly and became back to normal for himself.
Id.

Plaintiff's mother testified on May 23, 2017 that Plaintiff's limitations which she described at the hearing on May 23, 2017 were the same for Plaintiff as when he was younger than age 22.

Id. At the hearing on November 1, 2018, Plaintiff's mother further explained that Plaintiff had had these problems with his left side his whole life. (R. 83).

**E.     Vocational Evidence**

Testifying at the hearing ALJ hearing on May 23, 2017 was Dr. Larry Ostrowski, a vocational expert. (R. 57). The ALJ gave Dr. Ostrowski a hypothetical situation to analyze as follows:

> Q:      [L]et's assume a hypothetical individual the same age, education, and work background as the claimant, who is capable of performing work at the light level as defined in the regulations. All postural are unlimited, except as follows: Never climb ladders, ropes, or scaffolds; and only occasionally kneel or crawl. Work must not require exposure to hazards, such as dangerous moving machinery or unprotected heights; work should be limited to unskilled work in occupations with an SVP of 2 or lower, performed in an environment that does not require fast-paced production quotas or high-volume piecemeal quotas; no greater than occasional changes in work routine or work setting; and which requires only occasional simple work-related decision-making. Could this hypothetical individual perform any work? And if so, could you give me a few examples of jobs in the nation, and give me numbers of jobs for each occupation.
>
> [. . .]
>
> A:      I understand. Yes, your honor. There would be the work of the housekeeping cleaner. This is a light and unskilled job, with an SVP of 2. In the national economy, there's 340,000 jobs. And the DOT is 323.687-014. There would be the work of a mail clerk. And this would be an individual working in the mailroom of a business as opposed to working for the Postal Service. It is a light and unskilled job, with an SVP of 2. In the national economy, there are 71,000 jobs. The DOT is 209.687-026.There would be the work of a sewing machine operator. It is a light and unskilled job, with an SVP of 2. In the national economy, there are 61,000 jobs. The DOT is 786.685-030.
>
> [. . .]
>
> Q:      Okay. And if I were to change that hypothetical to say that work would be performed at the sedentary level, would there be work for this individual?
> A:      Yes, your honor. There would be the work of a surveillance system monitor. This would be a sedentary and unskilled job, with an SVP of 2. In the national economy, there's 25,000 jobs. The DOT is 379.367-010. There

would be the work of a document preparer. This is a sedentary and unskilled job, with an SVP of 2. In the national economy, there are 140,000 jobs. The DOT is 249.587-018. There would be the work of a table worker. This is a sedentary and unskilled job, with an SVP of 2. In the national economy, there are 10,000 jobs. The DOT is 739.687-182.

(R. 58-60).

The ALJ went on to inquire about a worker being off-task but maintaining competitive employment. Dr. Ostrowski testified that "an individual can be off task up to 10 percent of a workday or work period, and the individual still can achieve levels of productivity required by employers." (R. 60-61). The ALJ also inquired about degrees of employer tolerance for absenteeism. Dr. Ostrowski testified that:

My experience in working with employers and placing individuals into employment, returning injured employees back to work, and consulting with employers in a number of other capacities, that if an individual were late for work or leave work early or would miss an entire day, an employer would tolerate up to two of these incidences in a month's time before the individual may experience consequences…

(R. 61). Further, the ALJ further questioned Dr. Ostrowski as follows:

Q:   Dr. Ostrowski, would you please just take a moment to review the occupations you identified in response to my hypotheticals and compare their DOT requirements with the limitations in the hypotheticals. Are there any conflicts, apparent or otherwise, between the DOT requirements and the hypothetical limitations?

A:   No, your honor. My responses are consistent with the information contained in the Dictionary of Occupational Titles and the Selected Characteristics of Jobs reference.

Id. Plaintiff's attorney chose not to question Dr. Ostrowski when provided the chance. Id.

Then, testifying at the ALJ hearing on November 1, 2018, upon remand on Plaintiff's application from the Appeals Council, was Dana Stoller, a vocational expert. (R. 87). The ALJ gave Ms. Stoller a hypothetical situation to analyze as follows:

Q:   So, Ms. Stoller, let's assume a hypothetical individual the same age, education, and work background as the claimant, who's capable of

performing work at the light level as defined in the regulations. All posturals are unlimited, except never climb ladders, ropes, or scaffolds; and only occasionally kneel and crawl. Work should not require exposure to hazards, such as dangerous moving machinery and unprotected heights. Work should be limited to unskilled work in occupations with an SVP of 2 or lower performed in an environment that does not require fast-paced production quotas or high volume piecemeal quotas; no greater than occasional changes in work routine or work setting, and which requires only occasional simple work-related decision-making. Can the hypothetical individual perform any work in the national economy? And if so, please give me a few examples with numbers of jobs in the nation for each occupation.

A:     Okay. An example would be the title of housekeeper-hotel. The code of 323.687-014. This is at light exertion title, SVP 2, simple, unskilled. The national economy job title specific in that categories of title 100,000 [sic] full-time work opportunities. A second example is the title of office helper with a DOT code 239.567-010. It's a light exertion title. The SVP is 2, which is simple, unskilled. National economy job title specific, 14,000 full-time work opportunities. A third example is the title of cashier, which is 211.462-010. Light, SVP 2, simple, unskilled. And at the national economy, 200,000 full-time work opportunities. And those serve as examples, not exhaustive study or exhaustive listing.

Q:     Okay. And so if I took that same hypothetical, but added to it that work should not require continuous handling, pushing, or pulling with the non-dominant left hand and arm, would there be work for this individual?

A:     All right. So let's see. Let's go backwards here. So the housekeeper-hotel would remain able to be performed. The office helper title able to be performed without reduction or change. However, eliminate the cashier and provide another example to replace that title.

Q:     All right. And what would that be?

A:     That would be the title of mailroom clerk, which is 209.687-026. It's a light exertion title, SVP 2, simple, unskilled. National economy job title specific 16,000 full-time opportunities. And that's not in a post office setting. It's in a business kind of thing.

Q:     Okay. But the office helper and the house-keeper hotel, the numbers would stay the same?

A:     Yes, your honor…

(R. 88-90). The ALJ further questioned Ms. Stollar as follows:

Q:     All right. And if I took another hypothetical, and changed it to say that work would be performed at the sedentary level, would there be any work for this individual?

A:     Okay. And just to confirm on the other –

Q:     Yes.

A:     – limitations? Okay. Sure. So I would be able to provide some examples. So an example is the title of order clerk. 209.567-014. This is sedentary,

> SVP 2, simple, unskilled. National economy job title specific 12,000 full-time opportunities. Table worker. 739.687-182. This is a sedentary example, SVP 2, unskilled. National economy job title specific 7,600 full-time opportunities. Account clerk. 205.367-014. Also sedentary exertion title, SVP 2, simple, unskilled. The national economy, 6,100 full-time opportunities. And again, those are consistent without conflict with the DOT.

(R. 90-91).

The ALJ also inquired about degrees of employer tolerance for being off-task and for absenteeism.

> Q:   Okay. What is the customary tolerance for being off task and being able to maintain competitive employment?
> A:   Your honor, 10 percent of the eight-hour workday acceptable.
> Q:   And what would an employer tolerate as far as absenteeism goes?
> A:   Anything that would exceed 10 times a year. I would also add in my testimony, the first 90 days at any new employment is typically a probationary period. Any excused or unexcused absenteeism is simply not tolerated.

(R. 91).

Plaintiff's attorney cross-examined Ms. Stollar. The cross-examination initially focused on whether the duties of the positions described by Ms. Stollar could be completed with "only using one hand as a helper." (R. 92). However, the ALJ stated that the hypotheticals posed and limitations given already accounted for such a line of questioning. (R. 92-94). Plaintiff's attorney then questioned Ms. Stollar as to the ALJ's second hypothetical, limiting a claimant to sedentary work.

> Q:   If the hypothetical individual was limited to using his non-dominant hand solely as a helper hand, would he be able to perform the job as an order clerk?
> A:   … This job possibly could be performed. However, it would be much slower than other employees; would most likely require some type of accommodated or supported environment. However, the job would be able to be performed, and the would be a significant reduction in the national economy.
> Q:   How about for the other two jobs? –
>
> [. . .]

21

ALJ:    – what would that reduction be?

A:    . . . It would be a significant reduction of approximately 80 percent of the opportunities in the national economy on how this job would actually be performed without accommodations or some type of supportive environment.

ALJ:    Okay. So 20 percent of the numbers would remain without accommodation or supportive environment?

A:    I would agree. Yes.

(R. 94-95). Plaintiff's attorney further cross-examined as follows:

Q:    Would the same logic apply to table worker and account clerk?

A:    I would agree. Again, it would be a slower work production rate. And that would be production; I don't mean piece rate production. I mean functional rate.

Q:    Would you agree that most unskilled sedentary jobs require use – good use of both hands and fingers?

A:    Now you're using definitions. But yes, I would agree. Yes.

(R. 95-96).

## IV. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act[3], a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

---

[3] The ALJ's decision helpfully contextualizes the inquiry here to note that the relevant period here for determining disability ended over decades ago. (R. 17). For a determination of Child Disability Benefits, a claimant's level of function after age 22 is not dispositive. The focus is on level of function before turning age 22. "[I]f the claimant was not disabled as of his 22nd birthday, but then subsequently became disabled, this would not alter the outcome of this case." (R. 17).

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled

at one of the five steps, the process does not proceed to the next step. Id.

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

> 1.   **Born on September 5, 1976, the claimant had not attained age 22 as of September 5, 1976, the alleged onset date (20 CFR 404.102 and 404.350(a)(5)).**
>
> 2.   **The claimant has not engaged in substantial gainful activity since September 5, 1976, the alleged onset date (20 CFR 404.1571 *et seq.*).**
>
> 3.   **Prior to attaining age 22, the claimant had the following severe impairments: congenital hydrocephalus (Exhibit 4F/3, Exhibit 17F/161); right exotropia and nystagmus (Exhibit 2F); left hemiparesis (Exhibit 2F)**

and epilepsy (seizure free since 1987) (Exhibit 17F/161) (20 CFR 404.1520(c)).

4.     Prior to attaining age 22, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     Prior to attaining age 22, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) (i.e. was able to occasionally lift and/or carry no more than 10 pounds; frequently lift and/or carry articles like docket files, ledgers, and small tools; stand and/or walk, with normal breaks, for a total of 2 hours in an 8-hour workday; and sit, with normal breaks, for a total of about 6 hours in an 8- hour workday; except the claimant could not climb ladders, ropes, scaffolds; could only occasionally kneel and crawl; was limited to work that did not require exposure to hazards, such as dangerous, moving machinery or unprotected heights; was limited to unskilled work in occupations with an SVP of two or lower, performed in an environment that did not require fast paced production quotas or high volume piecemeal quotas, no greater than occasional changes in work routine or work setting, and which required only simple work related decision-making; and was limited to work that did not require continuous handling, pushing, or pulling with the non-dominant left hand and arm.

6.     The claimant has no past relevant work (20 CFR 404.1565).

7.     The claimant was born on September 5, 1976 and was 0 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.     Prior to attaining age 22, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, at any time prior to September 4, 1998, the date he attained age 22 (20 CFR 404.350(a)(5) and 404.1520(g)).

# VI. <u>DISCUSSION</u>

## A.     **Standard of Review**

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment … if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (quoting <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman</u>, 829 F.2d at 517.

"[Reviewing] courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize "the record as a whole" to determine whether the conclusions reached are rational." <u>Thomas v. Celebrezze</u>, 331 F.2d 541, 543 (4th Cir. 1964) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474 (1951)).

As such, "[reviewing courts] do not reflexively rubber-stamp an ALJ's findings." Lewis v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining their decision. An ALJ has a basic duty of explanation; their decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to their conclusion. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F3d 863, 872 (7th Cir. 2000). There are also some things an ALJ may not do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [their decision] while ignoring relevant evidence [to the contrary]." Lewis, 858 F.3d at 869 (quoting Denton v. Astrue, 596 F.3d 419, 426 (7th Cir. 2010). Moreover, while an ALJ is not required to discuss every piece of evidence, Reid v. Commissioner, 769 F.3d 861, 865 (4th Cir. 2014), an ALJ excludes relevant evidence at their peril.

In reviewing the Deputy Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman, 829 F.2d at 517.

**B.  Contention of the Parties**

Plaintiff, in his Motion for Summary Judgment, and Memorandum of Law in support, thereof, asserts that the Commissioner's decision is based upon four errors of law and fact. Specifically, Plaintiff alleges that:

1.      The ALJ erred because the "RFC is not supported by substantial evidence since it does not include any restriction for Plaintiff's severe vision problems nor any explanation as to why it failed to include any such restriction";

2.      The ALJ erred because the "RFC is not supported by substantial evidence and it failed to adequately account for claimant's left hand and arm problems, while the ALJ only paid lip service to SSR 96-9p which all but mandates a finding of disabled in such a situation";

3.      The ALJ erred when she "prohibited claimant from effectively cross-examining the vocational expert"; and

4.      The ALJ erred because her decision was "not supported by substantial evidence because [it] ignored the evidence and failed to account for Plaintiff's mental limitations."

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 9-1, at 9-14). Plaintiff asks the Court to grant his motion with a disability onset date of September 5, 1976, or in the alternative "remanded to the Social Security Administration Office of Disability Adjudication and Review … with directions to assigned a different ALJ." Id. at 15.

Defendant, in his Motion for Summary Judgment, and Memorandum in Support, thereof, asserts that the decision is "supported by substantial evidence." Def.'s Br. In Supp. of Mot. for Summ. J. ("Def.'s Br."), ECF No. 11, at 1. Specifically, Defendant argues that:

1.      The ALJ decision was correct because "Plaintiff failed to establish disability within the meaning of the Act";

2. The ALJ's decision was based on substantial evidence supporting the RFC determination for a limited range of sedentary work accounting for functional limitations associated with Plaintiff's impairments prior to his turning age 22;

3. Plaintiff's hearing was full and fair, and was before an unbiased ALJ; and,

4. The RFC determination accounts for additional limitations that the evidence supports.

Id. at 5-13.

## C.   Analysis of the Administrative Law Judge's Decision

### 1.   The ALJ did not err in finding Plaintiff failed to satisfy the Act's and Regulations' stringent requirements for a finding of disability, and incorporated work-setting limitations which account for issues with Plaintiff's vision.

Plaintiff takes issue with the ALJ's determination of RFC and whether it properly accounts for Plaintiff's vision problems. To determine whether a disability exists, the claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D.W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D.W. Va. Jan. 9, 2015) (internal citations omitted).

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such as walking and standing. 20 C.F.R. § 404.1521(b).

Any impairment must result from abnormalities, which can be shown by "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(b).  Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509.  See also 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217 (2002). Under the operable statute, for a claimant to be disabled, his impairments must be severe enough that the claimant cannot undertake any sort of substantial, gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A).

In the instant case, the ALJ undertook the required five-step analysis as required by pertinent regulations: (1) whether Plaintiff is working, (2) whether Plaintiff has a severe impairment, (3) if Plaintiff has an impairment, whether it meets the requirements of a listed impairment, (4) whether Plaintiff can return to past relevant work, if any, and (5) if Plaintiff cannot return to past relevant work, if any, whether he is capable of performing other work existing in substantial numbers in the national economy. (R. 11-13).

As part of this analysis, the ALJ rightly pointed out that Dr. Albrights's and Dr. Kureishy's opinions were generated some time after Plaintiff turned age 22, are cursory summaries, and are inconsistent with treatment notes about Plaintiff otherwise doing well in light of his limitations. (R. 19-20). Moreover, as to Dr. Kitt's opinion, the ALJ rightly gave it little weight because it was offered so long (two decades) after Plaintiff turned aged 22 "and does not address the objective evidence relating to the period at issue." (R. 20). Finally, the undersigned agrees with the ALJ that Dr. Kitts's conclusion about Plaintiff being unemployable is unreliable. This conclusion appears to be driven, at least in part, by a belief that Plaintiff continued to have seizures and that his shunt presented lifelong problems. However, as the ALJ's close scrutiny of the record shows, this is

contrary to other, objective evidence in the record for the relevant time period about how Plaintiff's shunt malfunction had stabilized and that he was free of seizures. (R. 20).

The ALJ squarely acknowledged that Plaintiff had certain conditions and limitations prior to his reaching age 22, namely: congenital hydrocephalus, right exotropia and nystagmus, left hemiparesis, and epilepsy. (R. 13). Yet, the ALJ also detailed how these conditions do not meet or medically equal any of the presumptively disabling impairments. (R. 15). After a detailed review of the record, questioning of vocational experts, and hearing thorough testimony from both Plaintiff and his mother regarding Plaintiff's impairments, the ALJ concluded the following as to Plaintiff's RFC: he could perform work with an SVP of 2 or lower that is unskilled and sedentary; for a total of two hours (in an eight-hour workday), Plaintiff could stand and/or walk; for a total of six hours (likewise in an eight-hour workday), Plaintiff could sit; Plaintiff should not climb ladders, ropes, and scaffolds; and Plaintiff could kneel and crawl on occasion. (R. 15-16). As to Plaintiff's limitations in a work setting, the ALJ concluded that he was unable to engage in continuous handling, pushing, or pulling with the non-dominant left hand and arm. Id. The ALJ also concluded that Plaintiff's work must be limited to exclude exposure to hazards (e.g. dangerous moving machinery, unprotected heights); that Plaintiff's work environment must not have fast-paced production quotas or piece mill quotas with high volume; that such an environment can present only occasional changes in work routine/setting; and that his occupation entail only simple decisions. Id. Then, taking all of these considerations and limitations into account, the ALJ found that there was work in the national economy in significant numbers which the Plaintiff would have been capable of performing prior to turning age 22. (R. 21). Therefore, the ALJ concluded, under the Act, Plaintiff was not disabled prior to turning age 22. Id. In so doing, the ALJ detailed a considerable array of Plaintiff's limitations and corresponding abilities, such that the undersigned

cannot agree that the ALJ failed to consider, account for, and properly accommodate vision limitations in reaching her conclusion.

2. **The ALJ did not err because the RFC determination is supported by substantial evidence, and accounts for the severe limitations, including limited use of the left hand and arm, which Plaintiff developed prior to turning age 22.**

Plaintiff suggests that the ALJ mischaracterized his history of certain achievements and engaging in certain activities but argues that these minimal activities are not representative of his ability to perform work activity. Specifically, Plaintiff takes issue with how the ALJ accounted for his left-side limitations. Plaintiff also takes issue with how the ALJ accounted for SSR 96-9p, which addresses claims implicating RFP for less than a full range of sedentary work. Defendant, on the other hand, points to the ALJ's detailed review of the record and evaluation of Plaintiff's limitations, and careful application of the Act's requirements to that information. Defendant also emphasizes the deferential review accorded to an ALJ's decision in this context.

As a threshold matter, the RFC is the maximum that a claimant can perform even taking into account a claimant's limitations. "Your residual functional capacity is the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1) (emphasis added). Under the Act and pertinent regulations, the ALJ is charged with determining RFC by considering all of the evidence in the record, medical and otherwise. See 20 C.F.R. §§ 404.1546(c), 404.1545(a)(3). To do so, the ALJ is directed to independently analyze the evidence in the record and develop the RFC based on relevant evidence. 20 C.F.R. § 404.1545. While a claimant may put forth subjective complaints, (and the ALJ may consider them), such subjective complaints, standing alone, do not establish disability. 20 C.F.R. § 404.1529(a). The factors and criteria in the pertinent regulations providing for the ALJ's objective analysis are pivotal in an ALJ's determination of RFC.

In the instant case, the ALJ reviewed an array of evidence, including testimony from both Plaintiff and Plaintiff's mother about his limitations with ambulation and Plaintiff's need to walk slowly and a step at a time, left hand dropped to his side, so as to avoid falls. (R. 16, 78). The testimony to this end also included descriptions of how Plaintiff has limitations on the left side of his body, resulting in difficulty lifting objects and the need to use his left hand as an aid or "helper." (R. 50-53). The testimony which the ALJ considered also described how Plaintiff had difficulty walking on steps, that he limps, that his legs are different lengths, that his left foot is two sizes smaller than the right, and that his left hand has more spasticity than the right. Id. Nevertheless, and as also summarized above, the ALJ concluded that Plaintiff, prior to turning age 22, had the RFC to perform work with an SVP of 2 or lower that is unskilled and sedentary, limiting Plaintiff to: standing and/or walking for a total of two hours (in an eight-hour workday), sitting for a total of six hours (likewise in an eight-hour workday), not climbing ladders, ropes, and scaffolds, and kneeling and crawling only on occasion. (R. 15-16). Further, the ALJ concluded that Plaintiff was unable to engage in continuous handling, pushing, or pulling with the non-dominant left hand and arm. Id. The ALJ also concluded that Plaintiff's work must be limited to exclude exposure to hazards (e.g. dangerous moving machinery, unprotected heights). Id. Notably, as part of this determination, the ALJ recognized that Plaintiff must be limited to sedentary work necessitating that Plaintiff not stand and walk for much of the workday. (Tr. 19).

As a further component of the RFC determination, and as to Plaintiff's specific argument as to these issues, the ALJ analyzed evidence as to hypotrophy of his left-side extremities. The ALJ accounted for how Plaintiff could lift as much as only 10 pounds only occasionally. Id. Taking into account the directive from the Remand Order from the Appeals Council, and mindful of the left-side manipulative limitations, the ALJ's determination of RFC limited for and did not require

continuous handling, pushing and/or pulling with the left hand and left arm. Id. However, and importantly, the ALJ specifically noted the lack of documented limitations in strength and sensation prior to Plaintiff turning age 22. Id. Thus, in determining RFC, the ALJ did not include additional limitations in this regard.

As a final component of the RFC determination, the ALJ analyzed Plaintiff's vision and balance limitations. In so doing, the ALJ concluded that Plaintiff cannot climb ladders, ropes or scaffolds. Id. Generally, the ALJ found, Plaintiff must avoid hazards. Id. The ALJ's determinations here had the corresponding effect of accommodating other issues with Plaintiff's weakness on his left side. Id.

The RFC determination is a product of treatment records during the relevant period before Plaintiff turning age 22, including Plaintiff's physical and mental limitations. In detail, the ALJ evaluated and relied upon several key pieces of relevant information in the record. The ALJ detailed how Plaintiff has been asymptomatic since his shunt revision in the early 1990s. (T. 970). The ALJ also focused on Dr. Field's treatment notes, summarized more fully above, in 1997 memorializing that Plaintiff was "remarkably well" and "quite functional." (R. 970-971). Subsequent treatment notes from Dr. Foley, another treating physician, summarized above, demonstrate that, in May 1998 and June 1999, Plaintiff's condition was favorable. (R. 974-976). Additionally, the ALJ focused on how, prior to age 22, Plaintiff earned a high school diploma and enrolled in community college courses, and remained involved in civic extracurricular activities. (R. 972).

It falls to a claimant in Plaintiff's position, as the movant, to show legal error which should result in a different decision by an ALJ in these circumstances. Shinseki v. Sanders, 556 U.S. 396, 409 (2009). Moreover, as previously noted, the burden is a claimant's to show disability under the

Act and pertinent regulations. Thus, Plaintiff must point to evidence that greater restrictions in the RFC are necessary. However, Plaintiff puts forth no such evidence about his condition during the relevant period. Certainly, Plaintiff has challenges and limitations, which are considerable. But he has not shown how the ALJ has failed to consider them and square them with the requirements for determining RFC under the regulations.

Even if Plaintiff may view the pertinent evidence differently than the ALJ, that unfortunately is insufficient under the regulatory rubric to upend the ALJ's determination. The ALJ's decision, so long as the finding is based upon substantial evidence, must stand under the deferential standard of review. Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). At bottom, the Court must determine if a reasonable decisionmaker could have found that, during the relevant period, Plaintiff could perform sedentary work on a reduced scale. Here, as set forth above, given the ALJ's consideration of VE expert testimony and of the record concerning Plaintiff's abilities and limitations thereof during the relevant period, a reasonable ALJ could have found as the ALJ did here.

### 3.  The ALJ was unbiased and provided a fair hearing.

Plaintiff complains that the ALJ did not allow for effective cross-examination of the VE such that the ALJ was biased. Certainly, Plaintiff is entitled to due process as part of a full and fair hearing. However, the undersigned does not agree that the ALJ was biased or that the hearing was flawed in this regard.

As an initial matter, Plaintiff bears the burden of demonstrating the ALJ's bias. Schweiker v. McClure, 456 U.S. 188, 196 (1982). Plus, the Court presumes that the ALJ is fair and unbiased. Id. at 195. Also well-established is that a party claiming bias must show that the ALJ was wholly unable to issue a fair decision. Liteky v. United States, 510 U.S. 540, 551 (1994).

Plaintiff's complaint in this regard seems to stem from the ALJ prohibiting counsel from asking repetitive questions of the VE during the hearing on November 1, 2018. However, in the undersigned's review of the record, specifically the transcript of this portion of the proceeding, Plaintiff's counsel attempted a repeated line of questioning about how or whether a certain job highlighted by the VE in a hypothetical could be performed. (R. 91-96). While the ALJ expressed frustration with counsel as to counsel's tardiness to the hearing, and may have been terse with counsel, the ALJ nevertheless gave counsel the opportunity to pose additional limitations as to the hypothetical, such that the VE then could give conclusions based upon such additional limitations. Eventually, Plaintiff's counsel indeed  posed additional limitations to the VE within the scope of the hypothetical, to which the VE responded that the limitations posed by counsel would limited the number of jobs significantly, with 20% of jobs remaining. (R. 95).

The ALJ's actions here are not evidence of bias, let alone a level of bias showing that the ALJ is unable to issue a fair decision. Plaintiff's counsel ultimately cross-examined the VE per the appropriate directive of the ALJ. Nothing about the ALJ's actions demonstrate anything but an effort to manage her caseload and operations.

**4.  The RFC determination by the ALJ accommodates additional limitations as to Plaintiff's mental condition during the relevant period.**

Plaintiff focuses his final argument as to alleged failure to account for his mental limitations in determining RFC. Plaintiff argues that limiting the pace of prospective work in the RFC is not sufficient to account for his mental limitations. However, as Defendant rightly points out, the five-step sequential analysis accounted for these mental limitations.

Specifically, the analysis stops at step two if no impairment is found to significantly limit a claimant's physical or mental ability as to basic work functions, and a claimant is not disabled under the regulatory scheme. Here, at step two, the ALJ acknowledged mental limitations

(borderline intellectual functioning) but highlights how Plaintiff's difficulty as to IQ testing during the relevant period was attributable to physical limitations more so that intellectual shortfalls. (R. 14). The ALJ also noted other factors such as how Plaintiff's academic performance improved in the relevant period, that the Plaintiff had developed the ability to use certain electronic devices, and was engaged in civic activity such as volunteering with 4-H and Special Olympics. Id. And in any case, the ALJ noted how Plaintiff's cerebral palsy interfered with equal use of his hands and led to psychomotor speed issues, and then made a RFC determination accounting for limitations as to speed and pace of work-related functions. Id.

Thus, the ALJ accounted for Plaintiff's limitations and incorporated them into the RFC determination.

## VII. RECOMMENDATION

For the reasons articulated above, the undersigned recommends the Defendant's Motion for Summary Judgment be **GRANTED**, and this matter be **DISMISSED WITH PREJUDICE.**

The parties shall have **fourteen (14) days** from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d

841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the Magistrate Judge's association with this case.

Respectfully submitted January 26, 2021.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE